**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
------------------------------------------------------------------ x
ETRAK İNŞAAT TAAHHÜT VE TİCARET ANONİM :
ŞİRKETİ,                                              :
                                                      :
                    Plaintiff,                        :
                                                      :
        -against-                        : Case No. 1:22-cv-00864-JMC
                                                      :
THE STATE OF LIBYA,                                   :
                                                      :
                    Defendant.                        :
                                                      :
                                                      :
                                                      :
                                                      :
------------------------------------------------------------------ x
```

**PETITIONER'S OPPOSITION TO THE STATE OF LIBYA'S NATIONAL OIL**
**CORPORATION'S MOTION FOR PROTECTIVE ORDER**

Petitioner Etrak İnşaat Taahhüt Ve Ticaret Anonim Şirketi ("Etrak" or "Petitioner"), through undersigned counsel, respectfully files this memorandum in opposition to the State of Libya's National Oil Corporation's ("LNOC") Motion for Protective Order (ECF No. 66). For the reasons set forth below, this Court should deny the Motion.

**INTRODUCTION**

The Foreign Sovereign Immunities Act does not permit a foreign state's wholly owned instrumentality to defeat post-judgment discovery by invoking formal separateness where it functions as the state's alter ego.

LNOC's Motion for Protective Order seeks to halt post-judgment discovery by asserting a form of immunity the FSIA does not recognize. As the Supreme Court made clear in *Republic of Argentina v. NML Capital, Ltd.*, the FSIA "says not a word" about immunity from discovery

and does not shield a sovereign (or its alter ego) from discovery in aid of enforcing a valid judgment. LNOC is the nominal movant, but the motion advances Libya's interests and depends entirely on the proposition that LNOC may be treated as legally insulated from Libya's judgment obligations. That proposition cannot be reconciled with *NML* or with *Bancec*.

The record already establishes that LNOC is not an independent market participant. Libya appoints LNOC's leadership, directs its core operations, and relies on LNOC to generate state revenue through commercial activity. LNOC's profits flow to the Libyan treasury, and its actions advance Libya's economic and policy objectives. In these circumstances, LNOC functions as Libya's commercial arm, not as a separate juridical entity entitled to obstruct enforcement proceedings. Recognizing separateness here would elevate form over substance and permit precisely the kind of evasion *Bancec* was designed to prevent.

LNOC's FSIA argument therefore fails as a matter of law. Under *NML*, the FSIA does not bar post-judgment discovery; under *Bancec*, an instrumentality functioning as the sovereign's alter ego cannot invoke formal separateness to avoid that discovery. LNOC's motion should be denied outright. Alternatively, if the Court concludes that alter-ego status cannot be resolved on the present record, LNOC cannot simultaneously shield the facts necessary to resolve that question. In that event, the Court should permit targeted discovery aimed at uncovering LNOC's governance, finances, and operational control so that the immunity issue may be resolved on a complete factual record.

## BACKGROUND

Libya has been dodging its obligations to Etrak for decades, though the dispute between the parties has evolved over the course of that time. To properly contextualize Etrak's discovery

efforts and LNOC's Motion, Etrak will summarize the history between the parties before turning to the discovery dispute. That history is lengthy but necessary to understand the instant dispute.

**Procedural History**

*The arbitration*

Beginning in the 1980s, Etrak—a Turkish company—carried out a number of public construction projects for Libya. ECF No. 21 ¶¶ 3, 16. When Libya failed to pay Etrak for its services, Etrak sued in Libyan court. *Id.* ¶¶ 16, 18. In October 2012, the Court of First Instance in Beida, Libya ordered the state to pay Etrak LYD (Libyan dinar) 1,906,360.23, plus interest, as well as LYD 1,000,000 in damages. *Id.* ¶ 18.

In December 2013, Etrak and Libya entered into a settlement agreement. *Id.* ¶ 19. Etrak settled its claims against Libya in return for payment of LYD 5,420,308.707, and the parties agreed to abandon further court proceedings relating to the Libyan court's award. *Id.*

When Libya failed to pay Etrak in violation of the settlement agreement, Etrak initiated arbitration proceedings with the International Chamber of Commerce ("ICC") pursuant to Libya and Turkey's bilateral investment protection treaty (the "BIT"). *Id.* ¶¶ 20-21, 23. The BIT requires Libya to accord Turkish investors "fair and equitable treatment" and settle disputes "in good faith," and provides for arbitration if those disputes cannot be resolved. *Id.* ¶ 22; ECF No. 1-4 at 44. Etrak submitted its request for arbitration to the ICC in August 2016, and the parties agreed to Geneva, Switzerland as the legal seat of the arbitration. ECF No. 21 ¶¶ 23– 24. Eversheds Sutherland ("Eversheds") represented Libya in the ICC proceedings. ECF No. 1-4, at 2.

While arbitral proceedings were pending, Libya returned to the Court of First Instance in Beida and appealed its 2012 judgment. *Id.* ¶ 25. In January 2018, the Libyan appellate court

overturned the judgment. ECF No. 1-7 at 24. In March 2018, Libya also initiated proceedings before the Court of First Instance in Tripoli, Libya, asking that the settlement agreement be declared invalid. ECF No. 21 ¶ 25.

The ICC arbitral tribunal issued Etrak's Award in July 2019. *Id.* ¶¶ 26–30; *see* ECF No. 1-4. In it, the tribunal concluded that Libya "failed to accord [Etrak]'s investment fair and equitable treatment" in violation of the BIT and awarded Etrak $21,865,554 USD in damages, plus interest and arbitration costs. *Id.* at 91–92.

In September 2019, Libya appealed the Award to the Swiss Federal Court, arguing that the tribunal lacked jurisdiction and the Award should be set aside. ECF No. 21 ¶ 31. In November 2020, the Swiss court found for Etrak. *Id.* Etrak commenced confirmation and enforcement proceedings around the world, including in Germany and France, where Eversheds again represented Libya. *See* ECF No. 29-2, at 36 (showing Eversheds represented Libya in Germany proceeding); ECF No. 31-4, at 1 (showing Eversheds represented Libya in France proceeding).

*Confirmation of the Award in the U.S.*

In 2022, Etrak initiated this confirmation action in the United States. ECF No. 1. Etrak effected service on Libya under 28 U.S.C. § 1608(3) on August 21, 2022. ECF No. 17. Etrak sought to have this Court confirm the Award to permit enforcement against Libya's U.S.-based assets. ECF No. 1, 28. On September 8, 2022, Eversheds partners John W. Lomas, Jr. and William T. O'Brien ("Eversheds Counsel") entered appearances on behalf of Libya. ECF No. 18-20. They moved on Libya's behalf to stay the case due to the ongoing confirmation proceedings abroad. ECF No. 22.

On February 4, 2025, this Court issued its Memorandum Opinion and Order granting Etrak's motion to confirm the Award and denying Libya's motion to stay. ECF Nos. 36 & 37.

One week later, Eversheds lawyer Jonathan Leach contacted Etrak's Turkish counsel to discuss the parties' ongoing dispute over Etrak's Award and arrange a meeting between the parties. *See* ECF No. 46-2, Email exchange between Etrak's and Libya's counsel. Mr. Leach and counsel for Etrak engaged in a consistent back-and-forth from that date through November 2025. *See id.*

On March 3, 2025, this Court entered Judgment for Etrak in the amount of USD 30,128,994.40 plus post-judgment interest at the statutory rate under 28 U.S.C. § 1961. ECF No. 39. The Judgment has been final for many months. Libya has failed to honor it to date.

*Post-judgment discovery efforts and Libya's ongoing frustration of same*

Although Eversheds continued to engage with Etrak's Turkish counsel regarding Etrak's dispute with Libya and the Award and attempted to arrange a meeting, *see* ECF No. 46-2, Libya did not honor the Judgment. As a result, Etrak issued post-judgment discovery requests under Rule 69 of the Federal Rules of Civil Procedure to gather information regarding assets of Libya against which the Judgment may be enforced. *See* ECF No. 46-3. In compliance with Rule 69 and Rule 5(b)(1), Etrak served these requests on May 21, 2025, by sending them to Eversheds Counsel, who remained enrolled in this action for Libya at the time. *See* ECF No. 46-4, at 2. The post-judgment discovery requests sought information or documents targeted to identifying executable assets under the FSIA. They therefore asked for information or documents generally related to Libya's bank accounts, banking activity, letters of credit and associated invoices and bills of lading, loans, any assets outside of Libya, the relationships between Libya and its agencies or instrumentalities, communications concerning Libya's repudiation or

payment/nonpayment of the Judgment or Award, and Libya's business activities in the United States. *See* ECF No. 46-3.

Etrak followed up on the requests on June 25, 2025, given Libya's failure to respond to the same despite the passage of the 30-day window for response. ECF No. 46-4. Etrak sought to confer with Libya regarding the lack of response and indicated that it would pursue a motion to compel if the responses were not forthcoming. *See id.* Although Eversheds Counsel were still enrolled in this action and Eversheds' Jonathan Leach was still acting explicitly on behalf of Libya's State Litigation Department in correspondence with Etrak's Turkish counsel, Eversheds Counsel responded on June 26, 2025 that Eversheds Counsel purportedly were not "authorized to accept service of discovery requests on Libya's behalf." *See id.* at 1.

One week later, on July 3, 2025, Eversheds Counsel filed a motion to withdraw. ECF No. 40. They sought to withdraw from the representation of Libya in this matter without substitution of other counsel. *Id.* Eversheds Counsel provided no compelling reason for the withdrawal, and they sought to require Etrak to make service of its discovery requests and any further pleadings in this matter in the manner allegedly "customary [for] notifying countries of any proceedings"—specifically, via "diplomatic channels." *Id.* In violation of Local Rule 83.6(c), the initial motion to withdraw and accompanying certificate of service failed to certify that Eversheds Counsel had advised Libya to obtain other counsel or to inform the Clerk in writing within 7 days that it intends to proceed *pro se*.

On July 17, 2025, Etrak timely opposed the initial motion to withdraw and, separately, moved to compel responses to its post-judgment discovery. ECF Nos. 42, 43. A few days later, this Court denied without prejudice Eversheds Counsel's motion to withdraw due to their failure

to provide the requisite Local Rule 83.6(C) certification. *See* Minute Order (July 21, 2025). This Court cautioned:

> Defendant's counsel's motion to withdraw as attorney does not comply with Local Civil Rule 83.6(c), which requires that "a motion to withdraw an appearance shall be accompanied by a certificate of service... stating that the attorney has served upon the party... notice *advising the party to obtain other counsel*, or, if the party intends to conduct the case pro se or to object to the withdrawal, to so notify the Clerk in writing within seven days of service of the motion."

*See id.* (emphasis in original).

On July 28, 2025, Eversheds Counsel filed a second Motion to Withdraw. ECF No. 44. Once again, they sought to withdraw without identifying substitute counsel and only because Libya purportedly "ha[d] not authorized [them to] engage on its behalf any further" in this matter. *See id.*

The following day, though Eversheds Counsel purportedly lacked any authority to do anything on behalf of Libya in this case at the time, they filed an opposed Motion to Stay and or for Extension of Time in relation to Etrak's then-pending Motion to Compel. ECF No. 45.

On July 31, 2025, this Court stayed this action, including the Motion to Compel, Motion to Withdraw, and Motion to Stay, until August 29, 2025—*i.e.*, for roughly one month—"to allow Defendant State of Libya to engage substitute counsel," failing which, this Court would rule on the Motion to Withdraw. *See* Minute Order (July 31, 2025).

Once the stay was lifted, and due to Libya's ongoing failure to respond to its post-judgment discovery, Etrak issued a document subpoena to the LNOC. On September 1, 2025, Etrak served notice of the subpoena along with the subpoena materials on Eversheds Counsel, who remained enrolled for Libya in this action. *See* Ex. 1 to the Declaration of Benjamin Reichard dated January 5, 2026 and filed herewith ("Reichard Dec."), LNOC Subpoena Notice. The following day, Etrak lawfully served the subpoena on LNOC's registered agent in Texas

with a return date of October 1, 2025, and with Houston, TX, as the place for compliance due to LNOC's office there. *See* Ex. 2 to the Reichard Dec., LNOC Subpoena Proof of Service. Etrak's requests to LNOC probed LNOC's relationship with Libya as well as its assets.

On September 5, 2025, this Court issued a Notice of Hearing setting a status conference for September 19, 2025. Before the hearing, in an abundance of caution, Etrak filed an opposition to the Motion to Stay opposing any further stay of the matter beyond the previous one-month stay already afforded to Libya. ECF No. 48.

On September 9, 2025, Etrak served Eversheds Counsel, who remained Libya's counsel in this action, with notices of deposition and the corresponding subpoena materials for two depositions of individuals likely to have information regarding Libya's business dealings in the United States: Monsef Elshalowi and Krystal Edwards. *See* Ex. 3 to the Reichard Dec., Elshalowi & Edwards Subpoena Notices. Mr. Elshalowi is Libyan and has worked for the LNOC, and Mrs. Edwards is American and was or is an LNOC employee. Mr. Elshalowi successfully dodged all service attempts, with persons at his home address denying he lived there and the LNOC denying the process server access to the building. Etrak lawfully served Mrs. Edwards with a deposition subpoena on September 9, 2025, with her deposition set for October 28, 2025, in Houston, TX. *See* Ex. 4 to the Reichard Dec., Edwards Subpoena Proof of Service. Etrak continued to serve Rule 45 subpoenas requesting the production of documents on other third parties likely to have information regarding Libya's executable assets, on each occasion serving Eversheds Counsel with a notice of the subpoena before issuing it.

The hearing proceeded on September 19, 2025, and the Court issued an Order that date memorializing its decision. ECF No. 49. First, the Court stated that it would grant the Motion to Withdraw if certain conditions were satisfied and ordered that:

- the clerk and Eversheds Counsel serve the Order on Libya;
- Etrak's service of its post-judgment discovery and other documents on Eversheds Counsel had been effective as to Libya;
- Eversheds Counsel provide "the names and contact information of specific individuals whom Plaintiff can contact regarding the post-judgment discovery" or, going forward, "serve any requests or correspondence concerning post-judgment discovery and collection"; and
- Eversheds Counsel notify the Court that it provided the contact information as ordered, at which point the Court "will issue an order relieving [Eversheds Counsel]."

*Id.* Next, the Court granted Etrak's Motion to Compel, ordering that:

- Libya respond to Etrak's discovery, including the production of requested documents, on or before November 3, 2025;
- Libya had waived any objections to the discovery; and
- If Libya fails to respond and produce documents on or before November 3, 2025, it must show cause on or before that date why it should not be fined "in the amount of $5,000 per week, doubling every four weeks until reaching a maximum of $80,000 per week, unless and until Libya satisfies its obligations under th[e] Order.

*Id.* Lastly, the Court denied Libya's Motion to Stay as moot. *Id.*

Eversheds Counsel provided undersigned counsel with the Libyan contact for correspondence or service of documents on September 30, 2025, and it notified this Court of that fact on October 3, 2025. *See* ECF No. 50. On October 6, 2025, this Court granted the Motion to Withdraw, at which point Libya was without counsel in this action. From that date forward, Etrak has corresponded with and served documents upon the contact previously provided to it by Eversheds Counsel for the State of Libya. Such correspondence and service has included, *inter alia*, additional notices of third-party subpoenas under Rule 45 along with the corresponding subpoena materials. *See, e.g.*, 66-3, at pp. 29-138.

On October 7, 2025, having received no response to the LNOC document subpoena despite passage of the date for compliance, counsel for Etrak telephoned the LNOC to inquire regarding the status of its response and documents. Counsel for Etrak spoke with a woman with

the LNOC regarding the same, who could not say whether LNOC would respond or put undersigned counsel in touch with anyone else who could do so. During the call, the woman informed counsel for Etrak that Mr. Elshalowi was no longer with the LNOC and obtained the woman's email address, which appears to be that of Soundos Alabbar, in order to send a copy of the previously served LNOC subpoena. Counsel for Etrak emailed Ms. Alabbar and attached a copy of the subpoena, which had been served on LNOC's registered agent on September 2, 2025. *See* Ex. 5 to the Reichard Dec., Email from Wells to Alabbar and bounce back (Oct. 7, 2025). A full day later, counsel for Etrak received an email indicating that, "[d]espite repeated attempts to deliver your message, the recipient's email system refused to accept a connection from your email system." *See id.* Soon thereafter, undersigned counsel saw that the LNOC Houston Branch website had become publicly unavailable.

On October 24, 2025, Etrak filed its Motion for Relief Under 28 U.S.C. § 1610(c) seeking an Order from this Court holding that a "reasonable period of time ha[d] elapsed following the entry of [its March 3, 2025] judgment" such that Etrak could proceed to attach and execute against Libyan assets to collect on the Judgment. ECF No. 52. Etrak corresponded with the Libyan contact to confer regarding the motion before filing, as well as to serve Libya with the motion and Etrak's reply in further support thereof. *See* Ex. 6 to the Reichard Dec., Email exchange between Wells and Libyan contact re 1610(c) motion and relief (Oct. 21-Dec. 10, 2025) (containing emails and their attachments in chronological order).

On October 28, 2025, though counsel for Etrak had heard nothing in response to its deposition subpoena to Mrs. Edwards, counsel appeared prepared to take her deposition at the time and place noticed. Mrs. Edwards dutifully appeared, and no attorney accompanied her. During the deposition, counsel for Etrak learned that Mrs. Edwards had been in touch with

Robert Garcia of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis"), whom she indicated represented the LNOC. She testified that she provided him a copy of the subpoena, which listed counsel for Etrak's contact information as well as the date, time, and location of the deposition. *See* Ex. 7 to the Reichard Dec., Excerpt of Krystal Edwards Dep. (Oct. 28, 2025) (hereinafter, "Edwards Dep."), at pp. 5-9. Nevertheless, neither Mr. Garcia nor any other attorney reached out to counsel for Etrak in advance of the deposition, sought to quash the subpoena or a protective order, or appeared at the deposition. Mrs. Edwards further testified that after returning from vacation subsequent to receiving the subpoena, which she had reported to her general manager, she found that access to her LNOC email account had been severed and that her access to LNOC's electronic document database had been revoked. Ex. 7, Edwards Dep., at 6, 22-26, 43-47. Mrs. Edwards provided other forthright testimony regarding the LNOC's—*i.e.*, Libya's—business in the United States. No privileged information was probed or revealed.

The court-ordered deadline for Libya to respond to Etrak's post-judgment discovery—November 3, 2025—came and went. Libya failed either to respond to the discovery and produce requested documents or show cause why fines should not be imposed. On November 5, 2025, Etrak filed a Notice of Noncompliance with Discovery Order to inform the Court that fines had begun to accrue and served the same on the Libyan contact. *See* ECF No. 53; *see also* Ex. 8 to Reichard Dec., Email from Wells to Libyan contact regarding noncompliance (Nov. 5, 2025).

On November 6, 2025, Etrak served on the Libyan contact notices of depositions and Rule 45 deposition subpoenas for six additional individuals likely to have knowledge about Libya's executable assets: Mohamed Denbarno, Anis Elfesatwi, Kevin Bernard, Soundos Alabbar, Hannah Sulaiman, and Eric Ou. Each were or are employees of the LNOC; some are Libyan. Etrak successfully and lawfully served the subpoenas on Mr. Elfesatwi on November 7,

2025; Mr. Denbarno on November 8, 2025; Mr. Bernard on November 10, 2025; and Ms. Alabbar on November 10, 2025. The depositions were noticed for December 9-11, 2025, in Houston, TX, within 100 miles of the witnesses. *See* Ex. 9 to Reichard Dec., Deposition Subpoena Packet (containing Libyan service of notices, subpoenas, and proof of service).

On or about November 18, 2025, undersigned counsel discussed the subpoenas with Mr. Garcia, who indicated that he represented only the LNOC. Mr. Garcia accused counsel for Etrak of violating ethical duties by taking Mrs. Edwards's deposition, though Mr. Garcia had been fully aware of the deposition, failed to contact counsel for Etrak regarding the same, failed to make any filing in an effort to prevent the deposition, and failed to appear at the deposition to defend the interests of his client, the LNOC. He then instructed undersigned counsel to withdraw its subpoenas. Undersigned counsel stated its position that counsel had violated no duties with Mrs. Edwards's deposition; plainly, a lawyer cannot prevent a deposition from occurring simply by refusing to show up. Etrak declined to withdraw any subpoenas.

On December 2, 2025, undersigned counsel sent a letter to Mr. Garcia indicating that Etrak intended to go forward with the depositions of Mr. Elfesatwi, Mr. Denbarno, Mr. Bernard, and Ms. Alabbar and provided the date, time, and location for each deposition. ECF No. 66-3, at 140. On December 4, 2025, Mr. Garcia responded, argued that LNOC was immune from discovery, and stated that "NOC's employees will not be appearing at the depositions." ECF No. 66-3, at 142. Subsequent e-mail communication between counsel further clarified that Mr. Garcia had instructed the individuals not to appear for their lawfully subpoenaed depositions. ECF No. 66-3, at 144-49.

On December 8, 2025, this Court granted Etrak's Motion for Relief Under 28 U.S.C. § 1610(c). ECF Nos. 56, 57. In the opinion, in addition to finding that Etrak was entitled to relief under Section 1610(C), this Court observed that:

- "Libya has demonstrated no efforts to pay the judgment";
- Libya "has taken actions which indicate to the Court that it is attempting to evade its obligation";
- "Libya has refused to engage new counsel even after the Court stayed the case to allow it to do so"; and
- "Libya has also failed to comply with this Court's order instructing it to respond to Etrak's post-judgment discovery requests."

ECF No. 56, at 2. The accompanying Order specifies "that a reasonable period of time has elapsed following entry of judgment" within the meaning of 28 U.S.C. § 1610(c) such that "Etrak may now seek attachment or execution" to "satisfy this Court's judgment." ECF No. 57. Etrak served the order on the Libyan contact. *See* Ex. 6 to Reichard Dec., Email exchange between Wells and Libyan contact re 1610(c) motion and relief (Oct. 21-Dec. 10, 2025) (containing emails and their attachments in chronological order).

On December 18, 2025, Joseph D. Pizzurro, a D.C.-based attorney with Curtis, filed a notice of Appearance of Counsel indicating that he was appearing in the case on behalf of the State of Libya. ECF No. 58. That date, Mr. Pizzurro also filed a Motion for Leave to Appear Pro Hac Vice for Mr. Garcia and a Notice of Retention of New Counsel, both of which indicated that Curtis and Messrs. Pizzurro and Garcia now represented and would be appearing on behalf of the State of Libya. ECF Nos. 59, 60. The following day, this Court granted Mr. Garcia's Motion for Leave to Appear Pro Hac Vice.

On December 22, 2025, Messrs. Pizzurro and Garcia ("Curtis Counsel") filed on Libya's behalf a "Response" to this Court's September 19, 2025, Order more than seven weeks after the Court-imposed deadline of November 3, 2025. ECF No. 62. The "Response" attempts to show

cause for Libya's ongoing contempt of this Court's Order and, simultaneously, to undo the past seven months of Etrak's hard work and this Court's rulings and sanctions. The "Response" was filed without leave of Court, without meeting the standard for an untimely pleading, and the stated "cause" for its ongoing contempt of this Court's orders—that post-judgment discovery is allegedly improper prior to a Section 1610(c) order—has been waived and is, in any case, wholly without merit. For these reasons and more, Etrak has filed a Motion to Strike the improper pleading. ECF No. 67. As of the date of this filing, Libya has accrued $80,000 in fines payable to Etrak for its ongoing noncompliance with this Court's September 19, 2025, Order, and it will continue to do so until Libya provides the information or documents Etrak requested in its post-judgment discovery.

Also on December 22, 2025, Curtis Counsel appeared on behalf of "Non-Party National Oil Corporation of Libya" in this action. ECF Nos. 63, 64. Curtis Counsel then filed that same date on LNOC's behalf the instant Motion for Protective Order arguing that LNOC is immune from Etrak's discovery efforts into Libya's executable assets. ECF No. 66. Its assertion of immunity extends even to Etrak's Rule 45 subpoenas directed to third parties other than LNOC, which—apparently, according to LNOC's reasoning—would extend even to the State of Libya.

As explained herein, LNOC is wrong on all counts. The U.S. Supreme Court is clear that the FSIA affords no immunity from post-judgment discovery. Etrak is entitled to the post-judgment discovery it seeks regarding Libya's executable assets, including with respect to the LNOC. The LNOC is wrong for the additional reasons that it is Libya's agent or alter ego. This Court should deny LNOC's Motion in full. Alternatively, if this Court determines that Etrak has not made the requisite showing with this opposition of LNOC's agent or alter ego status, this Court should permit jurisdictional discovery into LNOC and the *Bancec* factors.

**LNOC's Agent or Alter Ego Status & Commercial Activities**

Documentation available to Etrak at this time—which excludes the documents or information that this Court has ordered Libya to provide in post-judgment discovery—demonstrates LNOC's status as agent or alter ego of Respondent The State of Libya.

Libya is LNOC's founder as well as its direct and sole shareholder. *See* Ex. 10 to Reichard Dec., Expert Report of Alaref Kashar (Jan. 5, 2026) (hereinafter, "Kashar Report"), ¶ 12; Ex. 11 to Reichard Dec., Paris Court of Appeal, General Registry Number: No. RG 24/07515, Judgment of June 19, 2025, Certified English Translation (hereinafter, "Paris Judgment"), at 7. Libya established the LNOC in 1970 with Law No. 24 of 1970 "to assume the responsibility of controlling oil and gas production and overseeing all petroleum activities in Libya." *See* Ex. 10 to Reichard Dec., Kashar Report, ¶ 16; Ex. 12 to Reichard Dec., LinkedIn, Libyan National Oil Corporation. Libya reorganized the LNOC in 1979 by Decree No. 10 of 1979 by the General Secretariat of the General People's Congress[1] Reorganizing National Oil Corporation. *See* Ex. 10 to Reichard Dec., Kashar Report, at ¶ 11 & Ex. B (Decree No. 10 of 1979). "The hydrocarbon and oil materials existing underground inside [Libya] or its territorial waters and continental shelf remain the ownership of the state." *Id.*, Art. 4. The LNOC's purpose, then, is to "support [Libya's] national economy by means of developing, managing, and investing in oil." *Id.*, Art. 1.

---

[1] The then General People's Congress was the legislative body of the State of Libya from 1977 until 2011. It is equivalent in most respects to a national legislature. *See* Ex. 10 to Reichard Dec., Kashar Report, ¶ 9. Decree No. 10 of 1979 vests control over LNOC in the Libyan government, especially its General People's Committee—Libya's executive body from 1977 until 2011— which is akin to a Council of Ministers. Ex. 10 to Reichard Dec., Kashar Report, ¶ 10. Undersigned counsel will use the terms "General People's Committee" and "Council of Ministers" interchangeably and in accordance with the particular source being discussed at the time.

Though Decree No. 10 of 1979 recognizes LNOC as a juridical person, it subjects LNOC to Libya's control: Article 2 grants "[t]he Secretary of Petroleum [the] authority to supervise and to control [LNOC's] work" and deputizes the Secretary to implement the Decree. *See id.*, Arts. 2, 34. Decree No. 10 of 1979 establishes the LNOC's Board of Directors and declares that it will consist of a Chairman and four other members, one of whom must be the "General Secretary of Secretariat of Petroleum." *Id.*, Art. 22. The General People's Committee ("GPC") appoints all members, including the Chairman, and it determines their "salaries and financial privileges." *Id.* The GPC also possesses the authority to dismiss Board members, and Libya will do so by force where necessary. *See* Ex. 10 to Reichard Dec., Kashar Report, ¶ 33 & Ex. B (Decree No. 10 of 1979), Art. 28; *see also* Ex. 13 to Reichard Dec., Aljazeera, "Libyan oil firm chief denounces Tripoli's move to replace him" (July 14, 2022) ("The National Oil Corporation claims that Tripoli government forces stormed its headquarters to install a new director[, replacing] NOC chief Sanalla and appoint[ing] former central bank governor Farhat Bengdara in his place . . . ."). Though Article 23 authorizes the "[t]he Board of Directors [to] undertake[] the management of NOC's affairs," "executive policy," and "take decisions which it considers appropriate," many of the Board's decisions are ineffective until approved by the GPC or the Secretary of Petroleum. *See* Ex. 10 to Reichard Dec., Kashar Report, ¶¶ 40-41, 35-36 & Ex. B (Decree No. 10 of 1979), Art. 23. Decisions ineffective absent GPC approval include those relating to the LNOC's "goals, work programs, investments, employment and production"; "preparation of the estimated budget, the general budget and final accounts"; "approval of administrative, financial and technical regulations and policies of [L]NOC"; preparation of work or investment contracts and their submission to the General People's Committee for approval; and any decision to establish, amalgamate, or liquidate one of LNOC's subsidiaries. *See id.*, Kashar Report, ¶¶ 35-36 & Ex. B

(Decree No. 10 of 1979), Art. 24. Decisions ineffective absent Secretary of Petroleum approval include, with respect to LNOC's subsidiaries, creation of company bylaws, formation of a Board of Directors, and appointment of general managers; decisions regarding supervision of the subsidiaries and approval of estimated budgets; approval of general budgets and final accounts; disposal of funds and reserves for purposes other than those specified in the budget; and selection of LNOC representatives within the subsidiary. *See id.*, Kashar Report, ¶¶ 40-41 & Ex. B (Decree No. 10 of 1979), Art. 24. For all decisions, the Board reports directly to the Secretary of Petroleum. *See id.* Additionally, the Secretary of Petroleum has the authority to ask the Board to meet at any time, and in such cases he takes the position of Chairman. *Id.*, Kashar Report, ¶ 38 & Ex. B (Decree No. 10 of 1979), Art. 25. The Secretary is further authorized to assign the chairmanship of the Board temporarily to one of the members if the Chairman is absent or the position is vacant. *Id.*, Art. 22.

Libya enjoys other avenues of control. For example, the GPC has the sole authority to approve all contracts between the LNOC and foreign oil companies in the oil sector and to approve any amendment of such contracts, and the Decree authorizes the GPC to undertake this duty "without adhering to provision of Laws currently in force." *Id.*, Kashar Report, ¶ 28 & Ex. B (Decree No. 10 of 1979), Art.6. LNOC employees are considered public employees, *see* Ex. 10 to Reichard Dec., Kashar Report, ¶ 46, and the GPC is authorized to take necessary decisions to address the LNOC's redundant workforce. *See* Ex. 10 to Reichard Dec., Kashar Report, ¶ 34 & Ex. B (Decree No. 10 of 1979), Art. 32. LNOC is represented in legal disputes by Libya's State Litigation Department. *See* Ex. 10 to Reichard Dec., Kashar Report, ¶¶ 42-44.

Further, in 2022, Libya supplemented its oversight of the LNOC with its newly reorganized Supreme Council for Energy Affairs. Under Cabinet Resolution No. 790 of 2022,

the Supreme Council for Energy Affairs' membership includes the Prime Minister; the Central Bank of Libya Governor; the head of the Audit Bureau; the Ministers of Oil, Planning, Finance and Economy; and the heads of the National Oil Corporation, GECOL and the Renewable Energy Agency. *See* Ex. 14 to Reichard Dec., LibyaHerald, "Supreme Council for Energy Affairs holds first meeting" (Oct. 19, 2022). Its most prominent task is the supervision of sovereign issues related to energy activities, and it is seen by many as "the politicization of the Libyan energy sector[, including by] tak[ing] power away from the [LNOC]." *See id.* In addition to the GPC, the Supreme Council for Energy Affairs likewise reviews and approves LNOC reports, plans, and budgets. *See* Ex. 15 to Reichard Dec., The Libya Observer, "Government approves NOC plan for 2023-2027" (Mar. 30, 2023). It approved the LNOC's plan for 2023-2027 at a meeting attended by its head, Libyan Prime Minister Abdul Hamid Dbeibah, who afterwards described the discussions regarding LNOC production levels, estimated budget, emissions and alternative energy and called upon "all state institutions" to prioritize "supporting the National Oil Corporation and its programs." *Id.*

LNOC press releases suggest that the Libyan government has answered Dbeibah's call. For example, the LNOC and the Governor of the Central Bank of Libya are working to "enhance cooperation and ongoing coordination between the two sovereign institutions," including by "discussing financial arrangements to support the NOC's strategic plans to increase oil production and to overcome any obstacles that may hinder this goal, most notably the provision of the necessary financial resources." *See* Ex. 16 to Reichard Dec., LNOC Press Release, "Chairman of Board of Directors discusses with the Governor of the Central Bank of Libya ways to enhance cooperation between the two institutions" (Jun. 17, 2025).

Libya's control extends to LNOC's finances. The GPC controls both LNOC's funding and its budget and reporting. Under the Decree No. 10 of 1979, the LNOC's resources consist only of funds allocated to it by the state; loans arranged by LNOC internally or externally, subject to the exclusive authority of the GPC; and income generated by LNOC's activities, whether by investment, subsidiaries, or works and services rendered. Ex. 10 to Reichard Dec., Kashar Report, ¶¶ 19-26, 30 & Ex. B (Decree No. 10 of 1979), Arts 12, 1(12). Libya clearly controls what funds it allocates to LNOC, but its approval is also required for any loans as well as for its investments and the creation of any subsidiaries. *See id.*, Arts. 1(12), 7. Moreover, it is clear that in practice, the LNOC's funds flow from Libya. *See, e.g.*, Ex. 7 to Reichard Dec., Edwards Dep., at 100-101 (confirming that it was her understanding that the Libyan government was providing LNOC with its capital). LNOC advertises funding received from the Ministry of Finance, such as the 18.2 billion Libyan dinars that the Ministry of Finance transferred to LNOC in September 2025. *See* Ex. 17 to Reichard Dec., LNOC Press Release, "The National Oil Corporation (NOC) issues a statement on the amounts received from the Ministry of Finance and the expenditure mechanism for 2025" (Sep. 13, 2025). The funds had been allocated for LNOC as follows: 14.6 billion dinars for fuel purchases, 2.6 billion dinars for "salaries in the oil sector through the end of August 2025," and 1 billion dinars for LNOC's operating expenses. The State of Libya therefore pays the salaries of LNOC's employees. *See id.*

Libya even manages the manner in which LNOC sells its crude oil and purchases refined fuels. *See* Ex. 18 to Reichard Dec., LNOC Press Release, "National Oil Corporation Statement" (Mar. 25, 2025). Libya has "compelled" LNOC to employ an "offset mechanism" in its transactions with companies importing Libyan crude oil in order to supply fuel for domestic use. *See id.*; Ex. 10 to Reichard Dec., Kashar Report, ¶¶ 28, 34. "The supplying company deducts the

cost of the fuel from the total value of the crude oil imported from Libya. This process is conducted through banks under the oversight of the Audit Bureau and an independent international accounting firm." *Id.* "The offset mechanism for settling payments on fuel supplies [] was not the NOC's preferred choice. Rather, it was a last resort approved by the Council of Ministers in 2021 to ensure fuel delivery and alleviate the severe crises faced by the country, including fuel shortages for citizens and power plants." *Id.* Libya therefore oversees and exercises control over LNOC's business decisions.

The GPC must approve the LNOC's budget based on a proposal by the Secretary of Petroleum, Ex. 10 to Reichard Dec., Kashar Report, ¶¶ 20-21 & Ex. B (Decree No. 10 of 1979), Arts. 16, 19, and it must approve the LNOC Board of Directors' "preparation of the estimated budget, the general budget and final accounts." *Id.*, Arts. 23-24. The LNOC must obtain annual audits by "two or more auditors [serving one-year terms] whose appointment and financial rewards shall be determined by a decision from the Secretary of Petroleum." *Id.*, Art. 20; *see also* Ex. 11 to Reichard Dec., Paris Judgment, at 7 (confirming that the independent auditors are "appointed for a one-year term"). Those auditors must "present an annual report containing the results of their audit to the Board of Directors and Secretary of Petroleum," the latter of whom must then "present to the [GPC] committee a report on the performance of the NOC [that] must be accompanied with a copy of the annual report." Ex. 10 to Reichard Dec., Kashar Report, ¶¶ 29, 39, 45 & Ex. B (Decree No. 10 of 1979), Arts. 20-21. This, too, must be approved by the GPC. *Id.*, Art. 21. LNOC is also subject to audit by the Libyan Audit Bureau, which is the governmental agency tasked with conducting annual audits of Libyan state entities. *Id.*, Kashar Report, ¶ 45 & Ex. B (Decree No. 10 of 1979), Art. 20.

LNOC's profits flow to Libya, and Libya is the true beneficiary of LNOC's conduct. *See id.*, Kashar Report, ¶¶ 22-26. "The NOC's surplus revenues are paid to the Libyan central bank into the account of the Ministry of Finance." *See* Ex. 11 to Reichard Dec., Paris Judgment, at 8. The public record bears this out. In April 2025, in the face of controversy, LNOC's Chairman took it upon himself to assure the Libyan people "that oil revenues are transferred to the national treasury regularly and without delay." *See* Ex. 19 to Reichard Dec., LNOC, "National Oil Corporation Statement on Addressing Rumors and Unprofessional Analyses Regarding National Oil Revenues" (Apr. 3, 2025); *see also* Ex. 20 to Reichard Dec., Reuters, "Tripoli gov't gives Libya's NOC $1 billion in funding" (Oct. 6, 2019) (acknowledging that the "NOC in Tripoli has continued to control oil production, with revenues flowing through the central bank in the capital"). The announcement is in keeping with past press releases highlighting the LNOC's transfer of oil revenues to the Central Bank. For example, the LNOC publicized that it transferred $14,362,184,278 across 21 transactions between January 2024 and November 25, 2024. *See* Ex. 21 to Reichard Dec., LNOC Press Release, "National Oil Corporation Statement on Revenues" (Nov. 25, 2024).

Libya is dependent on this income and the opportunities that it provides. Libya authorized the LNOC to undertake the development of Libya's oil and gas resources, and Libya fundamentally relies on LNOC to do so effectively. Libya authorizes LNOC to serve as "the guardian of Libya's wealth and an impregnable fortress protecting its resources." *See* Ex. 18 to Reichard Dec., LNOC Press Release, "National Oil Corporation Statement" (Mar. 25, 2025). "[L]NOC is Libya's most important economic asset, providing most public revenue" even when rocked by instability. *See* Ex. 22 to Reichard Dec., Reuters, "Libya oil minister says he suspends NOC chief" (Aug. 29, 2021); *see also* Ex. 13 to Reichard Dec., Aljazeera, "Libyan oil firm chief

denounces Tripoli's move to replace him" (July 14, 2022) (reporting that the LNOC's "revenues are the source of all state funding"). LNOC advertises that it "accounts for almost all financial flows in Libya [and] exclusively supplies fuel for Libyan [domestic use]," solidifying it as a "catalyst for the sustained growth and development of Libya." *See* Ex. 23 to Reichard Dec., LNOC Press Release, "NOC Chairman shares perspective on conflict zone governance at Georgetown University" (Oct. 19, 2019) ("The chairman also emphasized the importance of NOC to the Libyan economy and warned against the partition of the sector: 'NOC accounts for almost all financial flows in Libya. The Corporation also exclusively supplies fuel for Libya power stations, desalination plants, hospitals and transport fleets. The country would grind to a halt if these key functions are impeded.'"); *see also* LNOC, "About Us," *available at* https://noc.ly/en/about-noc/ (last visited Jan. 5, 2026) (explaining NOC is catalyst for growth); Ex. 24 to Reichard Dec., LNOC, "About Us," at 2. Indeed, "[t]he oil sector in Libya creates 25% of all jobs and the NOC is the country's largest employer." *See id.*, at 4. The LNOC explains, Libya "relies directly on oil revenues to manage its affairs, [such that price fluctuations in the global oil market] cause[] profound damages to the Libyan state budget." *See* Ex. 25 to Reichard Dec., LNOC Press Release, "A Message from NOC Chairman, Eng. Masoud Suleman, to the OPEC Conference held in Vienna" (July 9, 2025).

LNOC has expanded into the United States to capitalize on the expertise there for Libya's benefit. In 2019, the LNOC "inaugurated its first international headquarters in Houston," "an office mandated to lead a 60 billion USD procurement drive to upgrade Libya's oil and gas sector and increase production capacity." *See* Ex. 26 to Reichard Dec., LNOC Press Release, "NOC opens first international office to lead 60 billion USD procurement drive" (May 10, 2019); *see also* Ex. 7 to Reichard Dec., Edwards Dep., at 11:1-12:12 (describing LNOC's U.S.-

based procurement efforts to obtain material and equipment for "all the oil and gas operations in Libya that fall under [the LNOC]"). The LNOC selected Houston, TX, as the location for its first international office "because of its strong links and importance to the Oil & Gas and Energy market" and to capitalize on "the important role that US companies and expertise can play in the development of our oil and gas sector." Ex. 26 to Reichard Dec., LNOC Press Release, "NOC opens first international office to lead 60 billion USD procurement drive" (May 10, 2019); *see also* NOC Houston Branch, Homepage, *available at* https://www.lnoc-us.com/ (last visited Jan. 5, 2026) ("Houston was carefully selected because of its strong links and importance to the Oil & Gas and Energy market."). According to the then-acting LNOC Chairman Mustafa Sanalla, "Houston will serve as vital procurement and engineering hub for NOC to tap into the best expertise and technology in the market. We intend to expand our capability and use of cutting-edge R&D to ensure Houston becomes the focal point for the development of our oil sector." Ex. 26 to Reichard Dec., LNOC Press Release, "NOC opens first international office to lead 60 billion USD procurement drive" (May 10, 2019). Mr. Sanalla further explained that the strong legal framework in the United States, with "no corruption," was key to LNOC's decision to locate in Houston. *See* YouTube, "Libya NOC Opening FINAL" (dated July 8, 2019 *available at* https://www.youtube.com/watch?v=HP20N8Q2dSQ (last viewed Jan. 4, 2026).[2]

Given Libya's above-described extensive control over LNOC, it is not surprising that the Paris Court of Appeal recently held the LNOC to be an emanation of the State of Libya and permitted execution against LNOC assets to honor an arbitral award against Libya. *See* Ex. 11 to Reichard Dec., Paris Judgment; *see also* Ex. 27 to Reichard Dec., LNOC Press Release, "Press

---

[2] The video is a copy of a news story entitled, "Libya National Oil Corp Opens Houston HQ," though neither the journalist nor his station or employer are identified. Among other things, it features clips of former NOC Chairman Mustafa Sanalla at the office opening explaining why NOC chose to open its first international office in Houston, TX.

Briefing" (July 23, 2025) (acknowledging the "final arbitration ruling from the [ICC] in Paris, issued in favor of Olin against the Libyan State on August 25, 2018" and the "Paris Court of Appeal rul[ing of] June 19, 2025, [that] determined that the NOC is considered an extension of the Libya State and that its assets do not enjoy immunity from enforcement"). The Paris Court of Appeal's Judgment is based upon LNOC's lack of functional and financial independence from the State of Libya. *See* Ex. 11 to Reichard Dec., Paris Judgment, at 6-8.

## LAW AND ARGUMENT

### A.  Etrak is entitled to all the post-judgment discovery that it is pursuing.

LNOC argues that it enjoys blanket immunity from discovery under the FSIA. It does not.

The rules governing post-judgment discovery are quite permissive. *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 138 (2014). "As a general rule, legal victors may engage in broad post-judgment discovery," including "sweeping discovery against foreign sovereigns." *Amduso v. Republic of Sudan*, 288 F. Supp. 3d 90, 94 (D.D.C. 2017); *see also Tatneft v. Ukraine*, No. CV 17-582 (CKK), 2021 WL 5353024, at *3-5 (D.D.C. Oct. 18, 2021) (citing *NML Cap., Ltd.*, 573 U.S. at 145). Indeed, the U.S. Supreme Court is clear that "[t]here is no … provision [in the FSIA] forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets." *NML Cap., Ltd.*, 573 U.S. 134, 142-143; *see id.* at 144-45. The Supreme Court in *NML* demanded a clear statutory statement of such effect, reasoning that "[e]lsewhere, it is clear when the [FSIA's] provisions specifically applicable to suits against sovereigns displace their general federal-rule counterparts." *Id.* at 143 (citing 28 U.S.C. § 1608(d)). It continued, "[f]ar from containing the 'plain statement' necessary to preclude application of federal discovery rules, the Act says not a word on the subject." *Id.* (citing *Societe Nationale Industrielle*

*Aerospatiale v. United States Dist. Court for Southern Dist. of Iowa*, 482 U.S. 522, 539 (1987)). In other words, immunity under the FSIA does not encompass immunity from post-judgment discovery. *See id.* at 144-45. Any contrary rule would conflate the discovery of executable assets with the attachment of those assets, and it would put judgment creditors in the impossible position of having to prove an asset is executable without post-judgment discovery into the asset. *See, e.g.*, *NML Cap., Ltd.*, 573 U.S. at 144-45 (explaining impossible position that would arise if foreign sovereigns enjoyed immunity from discovery into executable assets); *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 308 F.R.D. 27, 34 (D.D.C. 2015) (holding there is no "discovery-in-aid-of-execution" immunity under the FSIA).

Federal Rule of Civil Procedure 69(a)(2), which authorizes such post-judgment discovery, states that, "[i]n aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person—including the judgment debtor—as provided in the [Federal Rules of Civil Procedure]." *Id.* at 138-39 (citing 12 C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 3014, p. 160 (2d ed. 1997) (hereinafter Wright & Miller) (court "may use the discovery devices provided in [the federal rules] or may obtain discovery in the manner provided by the practice of the state in which the district court is held")). "[Rule 26] allow[s] for discovery 'regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *Owens v. Republic of Sudan*, No. CV 01-2244 (JDB), 2020 WL 4039302, at *2 (D.D.C. July 17, 2020) (quoting Fed. R. Civ. P. 26(b)(1)).

Moreover, "under Rules 33 and 34, a party against whom discovery is sought is under an obligation to actively search for relevant information it may not be aware of but is entitled to access." *Id.* Consequently, one responding to discovery must produce information or documents as long as the "information [is] available to [it]" or it has "the right, authority or practical ability to obtain the documents from a non-party to the action," respectively. *See id.*; *Amduso v. Republic of Sudan*, 288 F. Supp. 3d 90, 96 (D.D.C. 2017) ("If [the foreign sovereign] owns or controls a particular entity, any documents in that entity's possession are likely also within Sudan's control and therefore subject to discovery."); *Huthnance v. District of Columbia*, 255 F.R.D. 285, 292–93 (D.D.C.2008) (quoting *Alexander v. FBI*, 192 F.R.D. 50, 53 (D.D.C.2000) and *Trane Co. v. Klutznick*, 87 F.R.D. 473, 476 (W.D. Wis. 1980)); *see also* Jay E. Greig and Jeffrey S. Kinsler, Handbook of Federal Civil Discovery and Disclosure § 8:17, at 479 (2010) ("A party cannot avoid answering [an interrogatory] by alleging ignorance, if the party can obtain the necessary information through reasonable inquiry ... [a] party cannot limit its answer to matter within its own knowledge and ignore information readily available to it or under its control.... This may require a party to seek information from non-parties in order to answer the interrogatory."); *see also Bush v. Ruth's Chris Steak House, Inc.*, 286 F.R.D. 1, 5-6 (D.D.C. 2012) (regarding duty to produce documents as long as you have the ability to obtain them) (citing *United States ITC v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005)).

From the foregoing, two things are clear. First, Etrak is entitled to pursue discovery from Libya regarding its executable assets. *See NML Capital, Ltd.*, 573 U.S. at 141-45. Etrak's post-judgment discovery to Libya therefore properly sought information regarding, *inter alia*, LNOC's relationship to Libya as well as its assets. As the Paris Court of Appeals recently held, LNOC lacks any functional or financial independence from the State of Libya. *See* Ex. 11 to

Reichard Dec., Paris Judgment, at 6-8. The Paris Court apparently relied on much the same information presented here in forming its conclusions—that is, LNOC's state ownership; the Secretary of Petroleum's and General People's Committee's control over LNOC management, decisions, reports, budgets, and capital; and Libya's capture of LNOC profits. *See id.* Evidence available to Etrak supports the Paris Court of Appeal's conclusion, as does Mr. Kashar's expert opinion on the matter. *See supra* at pp. 16-22; *see also* Ex. 10 to Reichard Dec., Kashar Report, ¶¶ 12, 14-41. At a minimum, Libya sufficiently controls LNOC such that the latter's documents or information are "available" to the former, which therefore has the ability to obtain them. It would seem Curtis Counsel, who now represent both Libya and LNOC in this action, are in the perfect position to facilitate such sharing of information or documents.

In any case, to prevent Etrak from obtaining discovery from Libya into LNOC's relationship with Libya or LNOC's assets—*i.e.*, into the foreign sovereign's executable assets—Libya was required to object and make "a specific factual showing that [it] has no control over the records of [LNOC]." *Owens*, 2020 WL 4039302, at *4. It failed to do so, and this Court has already held that Libya waived its objections to the discovery, compelled Libya to respond, and imposed fines payable to Etrak for Libya's ongoing contempt. ECF No. 49. Counsel for Libya must not be permitted to frustrate Etrak's post-judgment discovery efforts now by attempting to have their other client, LNOC, do what Libya cannot.

Second, it was entirely proper for Etrak to seek discovery regarding the LNOC from banks, oil and gas companies, and individuals with knowledge, as well as directly from LNOC itself. Again, that LNOC may be "a foreign government sued under the Foreign Sovereign Immunities Act (FSIA), rather than a private party sued under some other legal authority, does not alter these [post-judgment discovery] standards." *Amduso*, 288 F. Supp. 3d at 94 (citing *NML*

*Capital, Ltd.*, 573 U.S. at 141-45). Binding precedent disposes of LNOC's discovery-immunity defense and authorizes Etrak to engage in post-judgment discovery into Libya's executable assets, including with respect to LNOC, whether from the LNOC or from the other subpoena recipients. *See NML Capital, Ltd.*, 573 U.S. at 141-45. Banks, oil and gas companies, and individuals with knowledge enjoy no immunity from discovery under the FSIA, and they possess relevant and discoverable information or documents, which are all the more valuable given Libya's ongoing contempt.

Though LNOC likens its employees to LNOC itself, those employees enjoy no immunity under the FSIA. *See Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) (holding that the FSIA affords no immunity to officials of a foreign sovereign who are sued for acts undertaken in their official capacity). Like foreign officials, who enjoy no immunity for acts undertaken in their official capacity for a foreign sovereign, *see id.*, LNOC's employees are not immune from Etrak's discovery into their knowledge of Libya's executable assets, including LNOC's relationship with Libya and assets, even if they obtained that information in their official capacity for LNOC. *See id.*

LNOC's authorities do not establish the sweeping immunity from discovery that LNOC claims in its Motion. LNOC relies upon *Peninsula Asset Mgmt. (Cayman) v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007), *Olympic Chartering S.A. v. Ministry of Industry and Trade of Jordan*, 134 F. Supp. 2d 528, 535-36 (S.D.N.Y. 2000), and *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268 (D.D.C. 2008) for the proposition that agencies and instrumentalities are "immune from post-judgment discovery where they were not parties to the underlying litigation." ECF 66-1, at 8. Yet, each of these non-binding authorities predates *NML Capital, Ltd.*, in which the Supreme Court clearly holds that the FSIA provides no immunity from

"discovery." *NML Cap., Ltd.*, 573 U.S. at 142 (holding that there is no "provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets"). *Peninsula Asset Mgmt.* involves no post-judgment discovery whatsoever. *See* 476 F.3d at 141-42. In *Olympic Chartering S.A.*, the court relies on a purported "immunity from discovery" under the FSIA that the Supreme Court has rejected, the petitioner did not argue alter ego status, and the discovery at issue was regarding a central bank's assets, which are generally not subject to the immunity exceptions in 28 U.S.C. § 1610. *See* 134 F. Supp. 2d at 530, 535-36; *see also* 28 U.S.C. § 1611(b)(1) ("Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution if . . . the property is that of a foreign central bank . . . ."). In *Peterson*, the agencies or instrumentalities at issue sought the court's protection from writs of attachment rather than post-judgment discovery, and in any case, the plaintiffs raised no credible immunity exception. 563 F. Supp. 2d at 270, 273-74.

LNOC may not like Etrak's discovery tactics, but Etrak is operating within legal limits. Etrak has a Judgment against Libya from this Court. Libya can put a stop to all of this by paying it. If LNOC desires to keep the precise mechanics of its relationship with Libya or the whereabouts of its assets private, then LNOC should instruct Curtis Counsel to advise its other client to honor this Court's Judgment or, at a minimum, provide the documents or information that this Court has already ordered it to provide.[3] Otherwise, Etrak is entitled to probe Libya's executable assets via post-judgment discovery, which discovery likely would be largely if not

---

[3] As it is, Libya has allowed what should have been a small settlement with Etrak to balloon by many millions of dollars through its repeated and ongoing contempt of the many tribunals who have touched the dispute between them. *See* Mohamed Dikna, The Law Society of Libya, *From Dinars to Dollars: Libya Must Disclose Its Assets in the United States in the $32 Million Etrak v. Libya Case*, available at https://lawsociety.ly/en/from-dinars-to-dollars-libya-must-disclose-its-assets-in-the-united-states-in-the-32-million-etrak-v-libya-case/ (last visited Jan. 3, 2026).

entirely useless if Libya's agencies or instrumentalities are afforded the kind of blanket immunity that LNOC asserts here.

**B. LNOC enjoys no immunity in this action because it is Libya's agent or alter ego.**

Because LNOC is subject to Libya's control and its alter ego, LNOC enjoys no jurisdictional immunity here.

The U.S. Court of Appeals for the D.C. Circuit applies the standard in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*") to determine whether an entity is an agent or alter ego of a foreign state such that its presumption of separateness is overcome. *See, e.g.*, *Helmerich & Payne Int'l Drilling Co. v. Venezuela*, 153 F.4th 1316, 1329 (D.C. Cir. 2025) (applying *Bancec* to determine that corporation was alter ego of Venezuela).[4] Under *Bancec* and its progeny, a court will disregard the entity's separateness where it is "so extensively controlled by [the state] that a relationship of principal and agent is created," or where treating the two as separate entities "would work fraud or injustice." *See id.* (regarding agency); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) (recognizing two bases); *Helmerich & Payne Int'l Drilling Co. v. Petroleos de Venezuela, S.A.*, 754 F. Supp. 3d 29, 48 (D.D.C. 2024) (quoting *Bancec* for the "fraud or injustice" exception), *aff'd sub nom. Helmerich & Payne Int'l Drilling Co. v. Venezuela*, 153 F.4th 1316 (D.C. Cir. 2025).

---

[4] In *Helmerich & Payne Int'l Drilling Co.*, the court examines agent or alter ego status within the context of a personal jurisdiction inquiry. *See* 153 F.4th at 1328-29. Though that question differs from what is presented here, the test for determining agent or alter ego status is the same. *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 138 (3d Cir. 2019) (applying *Bancec* factors to determine immunity status of assets belonging to Venezuela's alleged agent or alter ego).

Libya's domination of LNOC is more than sufficient to overcome any presumption of separateness between the entities. To determine whether the presumption is overcome, courts consider:

(1) the level of economic control by the government;

(2) whether the entity's profits go to the government;

(3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs;

(4) whether the government is the real beneficiary of the entity's conduct; and

(5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Id.* (citing *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 210 (2018); *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012); *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 300 (D.C. Cir. 2005)); *see also Crystallex*, 932 F.3d at 140-49 (explaining *Bancec* analysis). Though the level of control should exceed that of an ordinary majority shareholder, "the Supreme Court has [n]ever held absolute day-to-day control over operations to be necessary or even the touchstone of the alter-ego inquiry." *See Transamerica Leasing, Inc.*, 200 F.3d at 849; *OI Eur. Grp. B.V.*, 73 F.4th 73 F.4th 157, 173 (3d Cir. 2023). Courts caution that "[t]he question [of sovereign control over an instrumentality] defies resolution by 'mechanical formula[e],' for the inquiry is inherently fact-specific." *Helmerich & Payne Int'l Drilling Co.*, 153 F.4th at 1330 (quoting *Transamerica Leasing, Inc.*, 200 F.3d at 849). Even in the face of Libya's ongoing contempt of this Court's September 19, 2025, Order and without the documents and information this Court ordered Libya to produce, Etrak demonstrates below that this five-factor test is satisfied here.

With respect to the first and third factors, Libya exerts overwhelming economic and managerial control over LNOC. Libya reserved its oil and gas resources to the state, created and

authorized the LNOC to exploit them, and maintained its status as LNOC's sole and direct shareholder, thereby ensuring ultimate economic control over LNOC. *See supra* at 15; Ex. 10 to Reichard Dec., Kashar Report, at ¶¶ 12, 14-41; Ex. 11 to Reichard Dec., Paris Judgment, at 7 ("Its sole shareholder is the state . . . ."); *see also OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 172 (3d Cir. 2023) (relying in part on similar facts to find economic control). Libya controls both the funds that the LNOC has to spend as well as the ways that the LNOC spends it. *See* Ex. 10 to Reichard Dec., Kashar Report, at ¶¶ 12-13, 18-26, 30, 45, 47; *supra* at pp. 15, 19-22; Ex. 11 to Reichard Dec., Paris Judgment, at 7-8 (regarding LNOC's lack of financial independence). Libya in fact coerces LNOC to employ certain sales tactics against LNOC's wishes in order to benefit the state. *See* Ex. 18 to Reichard Dec., LNOC Press Release, "National Oil Corporation Statement" (Mar. 25, 2025) (regarding the "offset mechanism"); *see also OI Eur. Grp. B.V.*, 73 F.4th at 172.

Libya enjoys a high level of managerial authority over LNOC. Libyan law grants the Secretary of Petroleum overall "authority to supervise and control [LNOC's] work." *See supra*, at p. 16; Ex. 10 to Reichard Dec., Kashar Report, at ¶¶ 37. Though it vests the LNOC Board of Directors with managerial authority, Libya's GPC selects all board members, including the Chairman, mandates that one member be the Secretary of Petroleum's undersecretary, sets all members' financial compensation, and maintains the authority to dismiss them. *See supra*, at p. 16; Ex. 10 to Reichard Dec., Kashar Report, at ¶ 17. Libyan law further curtails the Board's authority by declaring its substantial decisions ineffective absent approval by either the GPC or the Secretary of Petroleum. *See supra*, at pp. 16-17; Ex. 10 to Reichard Dec., Kashar Report, at ¶¶ 36, 40. LNOC budgets, loans, investments, regulations or policies, and contracts must be approved by the GPC, which is also authorized to disregard Libyan law with respect to LNOC's

contracts with foreign oil companies. *See supra*, at pp. 16-17, 19-20; Ex. 10 to Reichard Dec., Kashar Report, at ¶ 36. Libya has further politicized the LNOC with the "Supreme Council for Energy Affairs," which also approves LNOC's plans and budgets. *See supra*, at pp. 17-18. Its membership includes government officials, including the Prime Minister, Central Bank Governor, and the heads of Ministries, who exert influence over the government to bend as necessary in support of LNOC. *Id.* Libya exerts control over LNOC exceeding that of an ordinary majority shareholder. Factors one and three weigh in Etrak's favor.

With respect to the second and fourth factors, it is undeniable that Libya enjoys the fruits of LNOC's labor. Because Libya is LNOC's sole shareholder, LNOC's profits ultimately flow to it. *See supra* at pp. 15, 21; *see also OI Eur. Grp. B.V.*, 73 F.4th at 172-73 ("Not all the *Bancec* factors are complicated inquires, and here, just as we explained in *Crystallex II*, "[a]s PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government."). This is also evident from the Paris Judgment, LNOC admissions, and news articles. *See supra* at pp. 21-24. Libya benefits from LNOC's development of the state's oil and gas resources, whether through the revenues LNOC transfers to Libya or via the opportunities LNOC affords the Libyan people as the country's largest employer. *See supra* at p. 15, 21-24. LNOC boasts that it "accounts for almost all financial flows in Libya." *See supra* at p. 22. Etrak easily satisfies these factors.

Lastly, Etrak will address the fifth factor—"whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations"—together with the "fraud or injustice" basis for alter ego status. *See Helmerich & Payne Int'l Drilling Co.*, 754 F. Supp. 3d, at 50 (noting that the fifth factor is less important for control than for "fraud or injustice" ). Both are satisfied here. When LNOC desired to open its first international office, it came to the United States. LNOC's then-Chairman Sanalla was clear

that LNOC made this decision both to benefit from the concentration of oil and gas expertise in the United States—Houston, TX, in particular—and due to the United States' strong legal framework, with "no corruption." *See supra* at 22-23. Permitting LNOC to seek out the U.S. market for the benefit of operating under our strong legal framework while allowing it to dodge post-judgment discovery in the manner it seeks to do here "would entitle the foreign state to benefits in United States courts while avoiding its obligations." Certainly, too, any finding that the LNOC is immune from Etrak's post-judgment discovery while Libya persists in its contempt of this Court's orders to pay Etrak or to provide information or documents regarding LNOC would benefit both of Curtis Counsel's clients in this action by allowing them together to frustrate Etrak's Award, Judgment, and post-judgment discovery. This Court must not allow Libya's post-judgment game of opossum to undermine Etrak's right to post-judgment discovery into Libya's executable assets.

This Court may disregard LNOC's separateness due to the extensive control Libya exercises over it and to avoid the "fraud or injustice" that otherwise would result.

### C.  At a minimum, Etrak is entitled to jurisdictional discovery from LNOC.

If the Court accepts, contrary to *NML*, that the FSIA forecloses Etrak's discovery efforts against LNOC and also finds that the record before it does not establish by a preponderance of the evidence that LNOC is Libya's agent or alter-ego under *Bancec*, then Etrak is at least entitled to an order of this Court that it may take jurisdictional discovery of LNOC in order to resolve the question of LNOC's alter ego status.

"A district court has broad discretion in its resolution of discovery problems that arise in cases pending before it." *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981). If a decision about the existence of jurisdiction under the FSIA "requires resolution of factual disputes, the court will have to resolve those disputes." *Bolivarian Republic of Venezuela*

*v. Helmerich & Payne Int'l Drilling Co*., 581 U.S. 170, 187 (2017). When subject-matter jurisdiction under the FSIA depends on disputed factual questions, "[t]he district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (quoting *Prakash v. American University,* 727 F.2d 1174, 1179–80 (D.C. Cir.1984)); *see Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017) ("A district court is 'typically within its discretion' to order jurisdictional discovery where a plaintiff has 'made out a prima facie case for jurisdiction.'") (quoting *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 401 (2d Cir. 2009)). Indeed, where a defendant challenges FSIA jurisdiction on the basis that an instrumentality is not the foreign state's alter ego, "jurisdictional discovery" may be necessary to resolve the factual predicate for that challenge because the facts are often exclusively within the foreign entity's control. *Phoenix Consulting*, 216 F.3d at 40. "[I]n order to get jurisdictional discovery," the party seeking discovery "must have at least a good faith belief that such discovery will enable it to show that the court has . . . jurisdiction over the defendant." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998); *see also Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 187 (D.D.C. 2018) (holding request for jurisdictional discovery is properly made in opposition to motion challenging jurisdiction).

Here, Etrak has asserted above numerous facts showing (1) the degree of economic control that Libya exerts over the LNOC through the budgetary process; (2) the degree to which it controls LNOC's affairs as a matter of Libyan law and as the 100% owner of LNOC; (3) the LNOC's profits flow to Libya and are deposited in the treasury; (4) Libya benefits greatly from

the LNOC's activity, with the revenues it generates comprising the majority of Libya's budget; and (5) how allowing for separate identity would work fraud and injustice upon Etrak in its decades-long effort to seek recompense from Libya. Those facts establish LNOC's alter-ego status under *Bancec*.

If the Court is unpersuaded by Etrak's showing, then it should permit Etrak to gather discovery directly from LNOC (and order the still-outstanding discovery it is owed from Libya), as Etrak's showing thus far demonstrates a good faith basis for permitting additional discovery. Apart from the declaration of its expert on Libyan law and the deposition testimony of the LNOC's supply chain manager, the record Etrak has established heretofore has been almost entirely sourced from news articles and public statements by the LNOC. Given the breadth and depth of these publicly available sources relied upon herein, Etrak has a good faith basis for requesting additional, specific discovery on the *Bancec* factors. At minimum, such discovery should include: (i) governance documents and corporate charters; (ii) documents evidencing appointment and removal authority of managers; (iii) communications regarding operational control by Libya; (iv) financial transaction records evidencing transfers between Libya and LNOC; and (v) internal policies dictating autonomy in commercial decision-making. This request is narrow and strictly tied to the *Bancec* analysis. *See Phoenix Consulting*, 216 F.3d at 40 ("jurisdictional discovery … should be carefully controlled and limited").

Permitting Etrak further discovery into the relationship of economic and managerial control between Libya and LNOC, the manner in which LNOC's daily affairs are managed, the ultimate destination of LNOC's profits and who dictates where those profits are directed, and the ways in which Libya benefits from LNOC's commercial conduct would aid this Court's fact-intensive analysis of the *Bancec* factors. Thus, Etrak easily meets the standard for articulating

how discovery would affect the jurisdictional determination. Moreover, granting LNOC immunity from discovery now on a cold record when jurisdiction turns on complex factual questions over which Plaintiff has had scant opportunity to obtain evidence (and where Libya has intentionally frustrated Etrak's efforts to do so) would contravene the FSIA's internal jurisdictional inquiry process.

## CONCLUSION

For the reasons stated herein, the Motion must be denied. In the alternative, this Court should permit Etrak to engage in jurisdictional discovery regarding LNOC in relation to the *Bancec* factors as outlined above.


**DATED:** January 5, 2026                    Respectfully submitted,

                                              /s/ *Benjamin D. Reichard*
                                              Molly L. Wells (*pro hac vice*)
                                              Benjamin D. Reichard (*pro hac vice*)
                                              **Fishman Haygood LLP**
                                              201 St. Charles Ave., Suite 4600
                                              New Orleans, LA 70170
                                              Tel.: (504) 556-5505
                                              Fax: (504) 586-5250
                                              Email: breichard@fishmanhaygood.com

                                              Charles Owen Verrill, Jr., Esq.
                                              Bar No. 13245
                                              Suite M-100
                                              1055 Thomas Jefferson St. NW
                                              Washington, D.C. 20007
                                              (202) 390-8245
                                              charlesverrill@gmail.com

                                              *Counsel for Etrak*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was served on all counsel of record this date via the Court's CM/ECF system.

*/s/ Benjamin D. Reichard*
Benjamin D. Reichard